IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 20, 2016 Session

## STATE OF TENNESSEE v. BRANDON SCOTT DONALDSON

Appeal from the Criminal Court for Knox County
No. 101256    Steven W. Sword, Judge

No. E2016-00262-CCA-R3-CD

The defendant, Brandon Scott Donaldson, appeals his Knox County Criminal Court jury convictions of second degree murder, attempted second degree murder, and employing a firearm during the commission of a dangerous felony, claiming that the trial court erred by excluding certain evidence and by giving certain jury instructions, that the evidence was insufficient to sustain his convictions of second degree murder and attempted second degree murder, that the sentence imposed was excessive, and that the cumulative effect of these errors prevented a fair trial. In addition, the defendant raises a number of challenges to the statute regarding the death of a fetus. Because the trial court committed prejudicial error by excluding as hearsay certain witness testimony, because this exclusion violated the defendant's constitutional right to present a defense, we reverse the defendant's convictions and remand for a new trial.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Reversed; Case Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., filed a separate concurring opinion in which NORMA MCGEE OGLE, J., joined.

Jonathan Harwell, Assistant District Public Defender (on appeal); and Troy L. Bowlin II and Sheena A. Foster, Morristown, Tennessee (at trial), for the appellant, Brandon Scott Donaldson.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Charme P. Allen, District Attorney General; and Kevin J. Allen and Molly Martin, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

The Knox County Grand Jury charged the defendant with alternative counts of the first degree murder of the victim, Marcia Crider, alternative counts of the first degree murder of the victim's unborn child, the attempted first degree murder of Ms. Crider's mother, Pebbles Renee Jones, and one count of employing a firearm during the commission of a dangerous felony arising out of the February 13, 2013 shooting that resulted in the death of the victim and her unborn child. The trial court conducted a jury trial in January 2015.

The State's proof at trial showed that, in late 2012 and early 2013, the 19-year-old victim lived with her mother in an apartment in Knoxville. In early December 2012, the victim was pregnant with her first child, and the victim's long-term boyfriend and father of her unborn child, DeAndre Crutchfield, had moved to Nashville. The victim and Mr. Crutchfield had separated at that time, although they continued daily communications.

Near the end of 2012 or in early January 2013, Mrs. Jones learned that the victim had become a friend of the defendant, whom the victim referred to as "L." Although the victim never told Mrs. Jones that her relationship with the defendant had advanced past friendship, Mrs. Jones was aware that the victim would stay overnight at the defendant's residence "two to three nights a week" in the weeks preceding the victim's murder. Mrs. Jones testified that the defendant was aware of the victim's pregnancy and that he had accompanied the victim to appointments with her obstetrician. Mrs. Jones testified that, prior to the day of the murder, the defendant "was very respectful" and "nice." Less than a week before the murder, the victim had selected a crib from a local store but had no means to transport it to her residence. The victim contacted the defendant, who drove to the store and transported the crib for the victim, telling Mrs. Jones that "[w]hat makes [the victim] happy makes [him] happy." Mrs. Jones was also aware that the defendant lived with his aunt, Angelia Knighton.

On February 12, 2013, the defendant picked up the victim from Mrs. Jones's residence, and the victim stayed at the defendant's residence overnight. The following morning, the victim contacted Mrs. Jones at "nine something." Mrs. Jones informed the victim that she was en route to work; the victim told Mrs. Jones that she loved her, and Mrs. Jones responded in kind. The victim contacted Mrs. Jones again at 10:15 and told her that the defendant had "put his hands on" her. Mrs. Jones informed the victim that she was on her way to pick her up. Before Mrs. Jones made it to her vehicle, the victim called back and told her that the defendant had taken $1,200 from her. Mrs. Jones explained to the jury that she had recently given the victim $1,000 to help defray the cost of items needed for the baby. Mrs. Jones again told the victim that she was on her way.

While en route to the defendant's residence, Mrs. Jones called the defendant:

> I asked him what was going on and did he put his hands on [the victim]. He said, "No." He said, "Miss Renee, your daughter is crazy."
>
> I don't care how crazy she is, you don't put your hands on her.
>
> And I – I said, "Look, I need to come and pick up what belongs to her."

Although the defendant initially told Mrs. Jones to meet him at a Hardee's restaurant near his house, he changed his mind and told Mrs. Jones to come to his house, explaining that he wanted "'to be sure that nothing of [his] is broke[n].'"

When Mrs. Jones arrived at the defendant's residence, the defendant was not present but both the victim and Ms. Knighton were. The victim was being "a little mouthy," and Mrs. Jones instructed her to "[h]ush" because she was "in somebody else's house," and she should "respect this woman." Mrs. Jones told the victim to collect her things, and Mrs. Jones asked Ms. Knighton if any of the defendant's things were broken. When Ms. Knighton responded in the negative, Mrs. Jones called the defendant to inform him of this, and the defendant appeared, walking toward the house. The victim told Mrs. Jones that the defendant had "a gun in his pocket." Mrs. Jones told the victim she wasn't "worried about him or his gun," and she told the victim to gather her belongings so that they could leave. Mrs. Jones noticed that the victim had a "red mark" on her neck.

When the defendant stepped inside the residence, he "reached in his pocket and he counted out $1120." The victim told the defendant that she had an additional $80, which the defendant disputed. The defendant told her that he had "'$3,000 in [his] pocket'" so "'[w]hat [did he] need [her] money for.'" The victim insisted that she was owed $80, and Mrs. Jones told her to leave it alone so they could leave. Mrs. Jones described the defendant's demeanor at this point as "very calm." Before the victim and Mrs. Jones could leave the house, the victim said to the defendant, "'Hmmm, I hope that $80 is worth that Sprite I poured in your shoes.'"

According to Mrs. Jones, the defendant "didn't say a word" but pulled a handgun from his right pocket and walked to his bedroom. While Mrs. Jones was rushing the victim out the door of the residence, she overheard Ms. Knighton say, "'No. No, L, no.'" Mrs. Jones and the victim "basically [ran] to the car." The victim got into the front passenger seat, and Mrs. Jones got into the driver's seat. The victim was "playing with her

phone," but Mrs. Jones saw the defendant walking toward their vehicle "with the gun in his right hand." As Mrs. Jones started to drive away, she heard a "pop, pop, pop, pop, pop." Because none of her windows shattered, she turned to the victim and said, "'Baby, I think we're okay.'" Mrs. Jones had driven past approximately nine houses on Porter Avenue when the victim turned to her and said, "'Mama, I've been hit.'" Mrs. Jones saw "blood gushing out of [the victim's] nose and her mouth." She stopped the vehicle and called 9-1-1; the records custodian for Knox County Emergency Communications District testified that a call reporting a homicide on Porter Avenue came in at 10:53 a.m. Mrs. Jones insisted that, between the time the victim told the defendant about pouring Sprite on his shoes and stating that she had been hit, the victim said nothing.

Mr. Crutchfield testified that, on the morning of February 13, he was awakened by a telephone call from the victim. Before he could speak, he heard the victim "screaming, 'Quit hitting me. I'm pregnant.'" Mr. Crutchfield could not hear any other voices in the background. He demanded to know what was happening, and the victim told him that "he" took her money, but she did not identify the alleged thief. The victim and Mr. Crutchfield continued exchanging telephone calls and text messages over the course of an hour regarding Mr. Crutchfield's plans to drive to Knoxville and the victim's intent to contact the police. Mr. Crutchfield sent a text message to the victim at 11:09 a.m. asking her for an update, and he received no response.

The defendant's half-brother, Alexander Branner, testified that the defendant contacted him following the shooting and asked Mr. Branner to leave the state with him. Mr. Branner, who had an outstanding warrant for violating his probation, agreed to go with him. Mr. Branner's girlfriend agreed to register a vehicle in her name, which vehicle Mr. Branner and the defendant drove to Rockford, Illinois on March 4. Both men were arrested in Rockford on March 10, 2013. While hiding in Illinois, the defendant told Mr. Branner about the events of February 13:

> He told me he was staying with a female at the time that was a girlfriend. And the morning that it happened, he told me they had been arguing that morning over a financial dispute. And he tried to break up with her but she wouldn't leave. He told me he tried to pack her stuff for her, but she was fighting him the whole time, calling him out his name, being disrespectful the whole time.
>
> And he finally got her stuff packed up and he threw it in the front yard. And when he threw it in the front yard, she followed him out there, at which time he left and came back.

- 4 -

When he came back, she was still there, but her mother was there, also.

And to his – the front door to his house that he was staying in was open, so he went in. They passed each other coming . . . .

. . . .

He went to his room and his room was destroyed, clothes was destroyed. Said his room had been ransacked.

And when he came back to the front yard he said the – the – the lady and her mom were getting in the car, pulling off. But as they were leaving, she hung out the window and said, "That's why we got herpes together."

At which point he blanked out. He had a gun on him, and he shot at the car. And when he came back to, he said there were bullet shells around his feet and the car was pulling off around the block.

On cross-examination, Mr. Branner elaborated that, during the argument on February 13, the victim had threatened to "have [the defendant] robbed" and had mentioned that she knew where the defendant's mother lived and where the defendant kept his money. The victim continued to make these threats when the defendant returned to his house to examine his room, shortly before shooting the victim.

Knoxville Police Department ("KPD") Sergeant Jonathan Chadwell responded to the scene of the shooting. Emergency medical personnel were on the scene, tending to the victim, and other KPD officers were speaking with Mrs. Jones. Sergeant Chadwell proceeded to the defendant's residence, where a woman answered the door and told him that no one else was inside. Sergeant Chadwell verified that information and noted the strong smell of marijuana emanating from the residence. Sergeant Chadwell did not, however, notice the smell of bleach and did not find the residence to be in disarray. KPD Officer Brandon Wardlaw, who also responded to the crime scene, testified that he, too, did not smell bleach in the house and did not notice any sort of damage to the interior.

When KPD Officer and Crime Scene Analyst Edward Johnson responded to the crime scene, he took dozens of photographs of Mrs. Jones's vehicle and the surrounding scene, which photographs were admitted into evidence. Officer Johnson later

photographed the trajectory of the bullets using trajectory rods. He testified that the vehicle had been struck six times: two bullets were discovered inside the vehicle, two bullets were recovered from the victim's body during the autopsy, one bullet ricocheted off the back window, and one bullet entered and exited the driver's side of the vehicle. One of the bullets entered through the vehicle's trunk lid, continued through the backseat, and penetrated the lower part of the front passenger seat, which trajectory was consistent with the victim's being struck in the lower left side of her back. Officer Johnson testified that he recovered a total of 11 shell casings and one cartridge from the scene.

Officer Johnson also photographed the interior of the defendant's residence, and he did not recall the smell of bleach. Officer Johnson, in describing the photographs, mentioned the presence of a Sprite can in the floor of the defendant's bedroom. Officer Johnson confiscated a handgun magazine and two boxes of ammunition from a drawer in the defendant's bedroom. On one side of the bedroom, several pairs of athletic shoes were visible, including two pairs of "Jordans," and Officer Johnson testified that those shoes and the surrounding floor were "damp" where "some type of clear sticky liquid" had been spilled.

KPD Officer and Firearms Examiner Patricia Resig testified as an expert witness in the area of firearms identification. Officer Resig stated that she examined the 11 nine-millimeter shell casings that had been recovered by Officer Johnson and determined that all had been fired from the same semi-automatic weapon.

KPD Sergeant Brian Dalton testified as an expert in shooting incident reconstruction. After examining Mrs. Jones's vehicle, Sergeant Dalton determined that there were "at least six projectiles indicating six different flight paths through this vehicle." The first projectile he examined entered through the glass of the rear passenger-side window and damaged the front passenger seat. Another projectile entered the vehicle's trunk and continued through both the back seat and the lower portion of the front passenger seat. A third projectile ricocheted off the vehicle's trunk, and another projectile entered the vehicle near the rear driver-side taillight, but neither projectile entered the passenger compartment. A fifth projectile entered through the left side of the trunk and ended in the backseat armrest. Finally, the sixth projectile penetrated the rear bumper and exited the bumper behind the driver-side rear tire.

With respect to the position of the defendant relative to the position of the vehicle at the time of the shooting, Sergeant Dalton made the following observations:

> [W]e're seeing that this vehicle was hit from multiple different points from the passenger side all the way around to something that was parallel to the driver side. So again, vehicle's moving;

it's changing elevation in the roadway if the shooter is staying fixed; or the shooter is moving and the vehicle's staying fixed; or both of those are changing at the same time.

KPD Major Crimes Investigator Lynn Clemons testified that the United States Marshals Service located the defendant in Cook County, Illinois on March 8, 2013. Investigator Clemons flew to Illinois a few days later to interview the defendant and have him transported back to Knoxville.

Doctor Christopher Lochmuller, Chief Deputy Medical Examiner for Knox County, conducted the victim's autopsy. Doctor Lochmuller testified that the victim had sustained two gunshot wounds: one entered the right side of her upper back, and one entered the left side of her lower back. The bullet that entered the victim's upper back passed through the victim's right third rib, the right lung, the aorta and pulmonary trunk, the left lung, and lodged within her left breast. The other bullet entered the lower left side of the victim's back, passed through the left side of her pelvis, penetrated her uterus and passed through the head of her 13-week-old male fetus, and ended in the victim's bladder. Although the gunshot wound to the victm's lower back was "potentially survivable," the other wound "was highly likely to be fatal within minutes." The injury to the fetus, however, was "a nonsurvivable injury." Toxicology tests on the victim's blood were negative for alcohol but revealed the presence of marijuana metabolites.

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon* colloquy, the defendant chose not to testify but did choose to present proof.

Angelia Knighton testified that the defendant had been living with her on Porter Avenue for approximately eight months prior to the shooting and that the victim would stay overnight with the defendant two or three nights a week. On February 13, 2013, Ms. Knighton was awakened by the sound of arguing coming from the defendant's bedroom. Concerned, Ms. Knighton entered the defendant's room and saw that the defendant "had tears in his eyes." The defendant told the victim that she needed to leave because she had "'put [her] hands on [him] too many times.'"

Ms. Knighton testified that, following the argument, the defendant left the house and returned sometime later, at which point he gave the victim $1,200. The victim was "fussing" at the defendant, and the defendant walked away toward his bedroom. When the defendant reemerged from his bedroom, the victim was "very upset" and was still arguing with the defendant. The victim told the defendant that she had "poured Sprite in all of his brand new tennis shoes" and had "poured bleach all over" several "pairs of jeans [that] still had the price tags on them." Ms. Knighton explained that she had a

breathing condition and that the fumes from the bleach were so severe that she had placed the clothing items into a bag and had thrown the bag into the garbage after the defendant left later that day.

After the victim and Mrs. Jones left the house, Ms. Knighton was "hanging onto" the defendant in an attempt to prevent him from leaving the house because she knew that he "had a gun in his hand." Before Mrs. Jones pulled away from the defendant's house, the victim was "screaming" at him from the vehicle, and Mrs. Jones "hit the accelerator" and started to speed away.

On cross-examination, when asked why she had not mentioned the bleach to officers during the course of her six-hour interrogation, Ms. Knighton said that she "thought" she had. Ms. Knighton conceded that she had not provided officers with the defendant's real name, only referring to him as "L" instead, and she acknowledged that she had told officers that she did not know who the defendant's mother was, explaining that it was "not [her] job" to find the defendant. Ms. Knighton insisted that the defendant's taking money from the victim had "nothing to do with" their argument. Ms. Knighton testified that she never saw the defendant strike the victim, but she admitted that the defendant had grabbed the victim by her coat and dragged her into the living room.

Based on this evidence, the jury convicted the defendant of the lesser included offenses of two counts of second degree murder and one count of attempted second degree murder, and the jury found the defendant guilty as charged of the crime of employing a firearm during the commission of a dangerous felony. Following a sentencing hearing, the trial court imposed sentences of 25 years each for the second degree murder convictions, eight years for the attempted second degree murder conviction, and 10 years for the firearm conviction, all to be served consecutively to one another for a total effective sentence of 68 years. Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal.

In this appeal, the defendant contends that the trial court erred by excluding certain evidence and that the exclusion of the evidence deprived him of his constitutional right to present a defense; that the trial court erred in its instructions to the jury on second degree murder and voluntary manslaughter; that Tennessee Code Annotated section 39-13-214, which defines a human embryo or fetus as "another" for purposes of criminal offenses, is void for vagueness and is unconstitutionally broad; that the evidence adduced at trial was insufficient to sustain his convictions of second degree murder and attempted second degree murder; that the sentence imposed was excessive; and that the cumulative effect of the errors prevented him from receiving a fair trial. We will address each issue in turn.

## I. Exclusion of Evidence

The defendant first contends that the trial court erred by excluding certain evidence at trial and that the exclusion of that evidence interfered with his constitutional right to present a defense. The evidence at issue concerns the exclusion of Ms. Knighton's testimony regarding statements made by the victim and the exclusion of some of the victim's telephone communications.

At trial, Ms. Knighton testified regarding the argument she overheard between the defendant and the victim on the morning of February 13. Ms. Knighton began to testify that she heard the victim referencing a sexually-transmitted disease when the prosecutor objected on the basis of hearsay. The trial court then conducted a hearing on the testimony outside the presence of the jury, at which time Ms. Knighton testified, in pertinent part, as follows:

> Q: All right. So you – you said a lot of things to the [j]ury and – and – a few – few minutes ago, we had to cut you off.
>
> A: Okay.
>
> Q: What did you hear [the victim] say as she was crying and excited and angry? What did you hear her say?
>
> A: She called him a "dirty dick m-f" and told him that's the reason why his D-I-C-K was burning. And that they both was burning. And that's the reason why that she didn't give him none last night, because she went and got a shot, and "that's the reason why your you-know-what is still burning."
>
> And I guess he figured out, you know, why he was feeling the way he was feeling and the reason why she was doing it with him when she did it. Because I don't know if she was telling him another way matter [sic] that, you know –
>
> Q: What was – what was . . .
>
> A: – this is where it come from.
>
> Q: Okay. And what was your impressions, based on the statements that [the victim] was saying to [the defendant], what was – what was your impression?

- 9 -

A:      That . . .

        Well, my impression, the way I took it, the way she said it was that, you know, I mean, "I've done caught some type of venereal disease from somebody, and I went to bed and gave it to you."

Q:      Okay.

A:      "So that's the reason why I've been laying with you. Now we both have it. Now I'm fixed and you're not getting nothing."

Ms. Knighton continued, stating that, following this verbal altercation, the defendant left and that both she and the victim stayed in the residence.

Q:      Okay. Did [the victim] make any phone calls to her mom or anybody else?

A:      She had made a phone call. She was calling her uncles or her cousins or somebody, that she said that she had somebody to take care of him that was going to 'f' him up.

Q:      Okay. So you – you heard [the victim] say she had someone to take care of him, to 'f' him up?

A:      Yeah. I was standing right beside her.

When the defendant returned to the house and gave the victim her money, Ms. Knighton made the following observations:

Q:      [Were the victim and the defendant] arguing at that point in time?

A:      No. I mean, she was still, you know, babbling, saying – you know, fussing and stuff, you know. And her mom was telling her to hush. And she just kept on and kept on and kept on.

Q:     Okay.   So your words was "she was babbling and fussing and stuff."

A:     I mean, cursing and still calling him names.

Q:     Okay.

A:     And what she'll have done to him and –

Q:     Okay.

A:     – you know, a lot of threats.

At the conclusion of this testimony, the trial court ruled that the victim's statements, as offered by Ms. Knighton, "about the venereal disease, and getting somebody to come and . . . exact retribution on" the defendant are "clearly hearsay" not subject to any exception.   When the jury returned to the courtroom, the trial court instructed the jury "to disregard any statement that Ms. Knighton said that [the victim] said concerning venereal disease that either she had or [the defendant had]."

On appeal, the defendant argues that the trial court erred by excluding as hearsay both Ms. Knighton's testimony regarding the statements the victim made to the defendant regarding venereal disease and Ms. Knighton's testimony regarding alleged threats made by the victim against the defendant.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c).   "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id.* 802.

As our supreme court recently confirmed, "[t]he standard of review for rulings on hearsay evidence has multiple layers." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015), *cert. denied*, No. 14A1098, 2015 WL 5032354 (U.S. Oct. 13, 2015).   The "factual and credibility findings" made by the trial court when considering whether a statement is hearsay, "are binding on a reviewing court unless the evidence in the record preponderates against them." *Id.* (citing *State v. Gilley*, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)).   "Once the trial court has made its factual findings, the next questions – whether the facts prove that the statement (1) was hearsay and (2) fits under one the exceptions to the hearsay rule – are questions of law subject to de novo review." *Kendrick*, 454 S.W.3d at 479 (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)); *see also Gilley*,

297 S.W.3d at 760 (stating that because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law").

Turning first to the testimony of Ms. Knighton regarding the victim's telephone conversations and alleged threats against the defendant, such statements were not erroneously excluded. Ms. Knighton stated that the defendant had left the residence prior to the victim's telephone calls, and Ms. Knighton did not testify that she had relayed the information about the threats to the defendant prior to the shooting. Accordingly, such testimony was properly excluded as hearsay because it could only have been offered for its truth; if the defendant was unaware that the victim was seeking assistance to harm him, such evidence could not have provided adequate provocation for the subsequent shooting. Even if such testimony did not run afoul of the hearsay rules, it would have been irrelevant because nothing indicated that the statements had ever been communicated to the defendant. *See* Tenn. R. Evid. 401, 402.

Conversely, Ms. Knighton's testimony regarding the victim's statements to the defendant about giving him a venereal disease was clearly not offered to prove the truth of the matter asserted; rather, these statements were offered to show the potential effect on the listener, *i.e.*, the defendant. Because these out-of-court statements of the victim's were not offered for their truth, they did not qualify as hearsay, and the trial court erred by excluding them on that basis.

Having determined that the exclusion of this particular testimony was in error, we now turn to the question of whether this error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). We find that it does. Evidence that the defendant had been told, less than two hours before he fatally shot the victim, that the victim had transmitted a venereal disease to him would have certainly assisted him in his defense of adequate provocation. *See* T.C.A. § 39-13-211(a) ("Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner."). Moreover, by successfully arguing to keep this testimony from the jury, the prosecutor was able to emphasize repeatedly during closing argument that the nature of the dispute between the defendant and the victim was limited to the destruction of the defendant's shoes. The prosecutor ended his rebuttal argument thusly:

> The motive to kill her was because she disrespected him. Because she poured Sprite in his shoes. Because she tricked him. She – he'd given her back the money and she "aha'd" him. Aha.

And that's it. It's as simple as that. As silly and as stupid as this woman's death was and the death of Baby Crider, that's all it's about. A dang pair of shoes.

During closing argument, the prosecutor was also able to undercut Mr. Branner's testimony regarding venereal disease:

And what was the only – only variable that was different?

She put Sprite in his shoes.

And [the defendant] wants to say, you know, that – that through [Mr. Branner] that yelled out, "We got – that's why we got herpes together."

That doesn't even make sense. People don't get herpes together. One person gives another person herpes and you say, "You gave me herpes."

That doesn't even – so it doesn't even make sense. The – the – the exaggeration that they're trying to do, this hype, this make it look like she's so much – she's the Tasmanian Devil and he's just an altar boy, all through the exaggeration of facts.

The erroneous exclusion of Ms. Knighton's testimony as hearsay unquestionably affected the judgment and resulted in prejudice to the judicial process because it not only undermined the defendant's theory of adequate provocation but the exclusion actually benefited the State's theory that the *only* act of provocation was the destruction of the shoes.

The defendant also contends that the exclusion of Ms. Knighton's testimony regarding the victim's statements on venereal disease violated his constitutional right to present a defense.

Although "[p]rinciples of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony" favorable to his cause, *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000)), that right is not without limits, *see Flood*, 219 S.W.3d at 316 (citing *Chambers*, 410 U.S. at 302). Indeed, the Supreme Court has observed that "[i]n the exercise of this right, the accused, as is

required of the State, must comply with established rules of procedure and evidence." *Chambers*, 410 U.S. at 302. "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Chambers*, 410 U.S. at 302). To determine whether a particular evidentiary ruling has violated a defendant's constitutional right to present a defense, a reviewing court must consider:

> (1)  Whether the excluded evidence is critical to the defense;
>
> (2)  Whether the evidence bears sufficient indicia of reliability; and
>
> (3)  Whether the interest supporting exclusion of the evidence is substantially important.

*Flood*, 219 S.W.3d at 316 (citing *Brown*, 29 S.W.3d at 434-45; *State v. Rice*, 184 S.W.3d 646, 673 (2006); *State v. Rogers*, 188 S.W.3d 593, 614 (Tenn. 2006)).

In the instant case, as previously addressed, the trial court refused to admit Ms. Knighton's testimony regarding the victim's statements on venereal disease on the basis that it was inadmissible hearsay. Reviewing this decision against the criteria set forth in *Flood*, we find that the excluded evidence was critical to the defense, in that it hindered the defendant's ability to show that he had been adequately provoked, and we cannot say that the interest in excluding the evidence – which was not offered for its truth – was substantially important. Although the fact that the evidence was provided by the defendant's aunt, as opposed to a less interested party, undercuts the reliability factor, the critical nature of the evidence and the lack of substantial importance in excluding it amount to a violation of the defendant's constitutional right to present a defense. Thus, we find the trial court erred in refusing to admit this evidence which, along with the evidentiary error in excluding the same evidence, necessitates reversal of the defendant's convictions.

## *II.  Jury Instructions on Second Degree Murder and Voluntary Manslaughter*

The defendant's arguments relative to the jury instructions on second degree murder and voluntary manslaughter are myriad. First, the defendant contends that the trial court improperly instructed the jury on the mens rea of second degree murder and that the trial court erred by instructing the jury that voluntary manslaughter was a lesser included offense of felony murder. Second, the defendant argues that the trial court erred by using

the Tennessee Pattern Jury Instructions in charging the jury on the offense of voluntary manslaughter. Specifically, the defendant contends that the court erroneously instructed the jury that a "state of passion" was an element of voluntary manslaughter rather than a defense. Finally, the defendant argues that the trial court erred by its use of sequential jury instructions.

An accused's consitutional right to trial by jury, *see* U.S. Const. amend. VI; Tenn. Const. art. 1, § 6, encompasses a right to a correct and complete charge of the law, *see State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990). The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *see Teel*, 793 S.W.2d at 249; *see also* Tenn. R. Crim. P. 30.

The legal accuracy of the trial court's instructions is a question of law subject to de novo review. *See Troup v. Fischer Steel Corp*., 236 S.W.3d 143, 149 (Tenn. 2007). The propriety of a given instruction is a mixed question of law and fact to be reviewed de novo with a presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

When determining on appeal whether jury instructions are erroneous, this court should "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Stephenson*, 878 S.W.2d 530, 555 (Tenn. 1994)). A jury instruction is "prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id.* (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977)). Even if a trial court errs when instructing the jury, such instructional error may be harmless. *State v. Williams*, 977 S.W.2d 101, 104 (Tenn. 1998). An error will be considered harmless "unless, considering the whole record," it "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b).

*A. Mens Rea*

The defendant argues that the trial court erroneously instructed the jury on the mens rea of second degree murder by failing to specify that the defendant must be aware that his conduct was reasonably certain to cause the death of the victim and by failing to read the definition of the term "knowingly" in conjunction with the reading of the instruction on second degree murder.

The pertinent instructions given to the jury in the instant case are as follows:

If you have a reasonable doubt as to the [d]efendant's guilt of first-degree felony murder as charged in Counts 1 and/or 2 . . ., then your verdict must be not guilty as to this offense or offenses, and then you shall proceed to determine his guilt or innocence of second-degree murder, a lesser included offense of both the first and second counts.

Here are the elements for second-degree murder.

Any person who commits second-degree murder is guilty of a crime. For you to find the [d]efendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements.

And there are two.

The first one is that the [d]efendant unlawfully killed the alleged victim. And once again, as to the first count it's alleged to be Marcia Crider; and as to the second count it's alleged to be an unborn child of Marcia Crider.

And then the second element is that the [d]efendant acted knowingly.

"Knowingly" . . . [is] defined in the definition sections of these instructions. Refer to those definitions here. And they're a few pages into your booklet.

The defendant is correct that the trial court did not orally define "knowingly" in the context of its instruction on second degree murder, but the court did repeatedly inform the jurors that the definition of "knowingly" and other terms could be found in the definitions section of the jury instructions and that the jurors should refer to those definitions. The definitions section of the instructions properly defined "knowingly" as a person acting "with an awareness that h[is] or her conduct is reasonably certain to cause the result." Moreover, when providing the jurors with the instruction on the firearm charge, the trial court stated as follows:

For this offense, "knowingly" means that a person acts knowingly with respect to the conduct or the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts

- 16 -

knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

The instructions on second degree murder track the language of the pattern jury instructions and were a correct statement of the law. Thus, any potential error attendant to the trial court's failure to define "knowingly" contemporaneously with its reading of the second degree murder instruction is certainly harmless.

With respect to the defendant's contention that the trial court erroneously instructed the jury on the mens rea of second degree murder, the defendant claims that the court's definition of "knowingly" was "inadequate and misleading" because it failed to define the term "the result" to mean "the death of the victim." The defendant relies on this court's decision in *State v. Page*, in which this court reversed a second-degree murder conviction on the basis that the trial court had failed to properly instruct the jury that second-degree murder was a result-of-conduct offense rather than a nature-of-conduct offense. *State v. Page*, 81 S.W.3d 781, 788 (Tenn. Crim. App. 2002). The *Page* court offered suggested jury instructions for second-degree murder, which included a definition of knowingly to mean "that a person acts with an awareness that [his] [her] conduct is reasonably certain to cause the death of the alleged victim." *Id.*

Although the definition of "knowingly" in the instant case did not include the ending language of "the death of the alleged victim" rather than "the result," it did not act to alter the mens rea of second degree murder. The instruction given by the trial court still properly informed the jury that second degree murder was a result-of-conduct offense. Although the better practice would have been to use the precise language contained within the Tennessee Pattern Jury Instructions, *i.e.*, that knowingly means that a person was aware that his conduct was reasonably certain to *cause the death of the alleged victim*, any possible error in this regard would have had no bearing on the outcome of the trial and, consequently, would have been harmless. *See* Tenn. R. App. P. 36(b).

The defendant also argues that the trial court erred by instructing the jury that second degree murder was a lesser-included offense of felony murder. We disagree.

Tennessee Code Annotated section 40-18-110 plainly states that "[s]econd degree murder is a lesser included offense of first degree murder as defined in § 39-13-202." T.C.A. § 40-18-110(g)(1). Section 39-13-202 encompasses both first degree premeditated murder *and* felony murder. T.C.A. § 39-13-202(a)(1)-(2). Thus, the trial court properly instructed the jury on this issue.

## B. "State of Passion" and Sequential Jury Instructions

The defendant next contends that the trial court erroneously instructed the jury that a "state of passion" was an element of voluntary manslaughter rather than a defense and that the trial court erred by its use of sequential jury instructions. Because we believe these issues are effectively intertwined, we will address them together.

The trial court issued the following instructions to the jury, as are relevant to this issue:

> If you have a reasonable doubt as to the [d]efendant's guilt of first-degree felony murder as charged in Counts 1 and/or 2 . . ., then your verdict must be not guilty as to this offense or offenses, and then you shall proceed to determine his guilt or innocence of second-degree murder, a lesser included offense of both the first and second counts.
>
> Here are the elements for second-degree murder.
>
> Any person who commits second-degree murder is guilty of a crime. For you to find the [d]efendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements.
>
> And there are two.
>
> The first one is that the [d]efendant unlawfully killed the alleged victim. And once again, as to the first count it's alleged to be Marcia Crider; and as to the second count it's alleged to be an unborn child of Marcia Crider.
>
> And then the second element is that the [d]efendant acted knowingly.
>
> "Knowingly" and "intentionally" for this offense are defined in the definition sections of these instructions. Refer to those definitions here. And they're a few pages into your booklet.
>
> The distinction between voluntary manslaughter and second-degree murder is that voluntary manslaughter requires

- 18 -

that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

Again, "any alleged victim" includes a human embryo or fetus at any stage of gestation in utero.

If you find from the proof beyond a reasonable doubt the [d]efendant is guilty of second-degree murder, then you should find him guilty of that offense.

If you find that the State has not proven beyond a reasonable doubt the [d]efendant's guilt of second-degree murder in the first and/or second counts, or if you have a reasonable doubt as to his guilt of that offense or offenses, then your verdict must be not guilty as to that offense or offenses, and then you shall proceed to determine his guilt or innocence of voluntary manslaughter, a lesser included offense of both the first and second counts.

Voluntary manslaughter elements are as follows. Any person who commits voluntary manslaughter is guilty of a crime. For you to find the [d]efendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements. And there are three.

1. That the [d]efendant unlawfully killed the alleged victim. Again, in Count 1, the alleged victim is Marcia Crider; in Count 2 the alleged victim is an unborn child of Marcia Crider. And,
2. That the [d]efendant acted intentionally or knowingly; and,
3. That the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

Again, the distinction between voluntary manslaughter and second-degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced

by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

. . . .

You shall not proceed to consider any lesser included offense until you have first made a unanimous determination that the [d]efendant is not guilty of the immediately preceding greater offense or unanimously have a reasonable doubt of the [d]efendant's guilt of that offense.

We first address the defendant's claim that the trial court erroneously instructed the jury that "state of passion" was a required element of voluntary manslaughter which the State was required to prove. The defendant urges this court to adopt the position that the required state of passion should be treated as a defense rather than an element of the crime.

In our view, the references to passion and provocation by their very nature express neither elements of voluntary manslaughter that the State is required to prove nor an absolute defense; instead, they are a type of built-in mitigation to a knowing or intentional killing.

Voluntary manslaughter is a form of intentional or a knowing killing, as the case may be, the difference being that voluntary manslaughter, the lesser offense, is committed following "a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). Although the trial court in the instant case adhered to the long-standing practice of using acquittal-first jury instructions, and although the jurors in the instant case were instructed on the distinction between second degree murder and voluntary manslaughter, they were also instructed – in no uncertain terms – that they "*shall not proceed* to consider any lesser included offense until" first making a unanimous determination on the "immediately preceding greater offense." (Emphasis added). This, we believe, creates a conundrum. If jurors unanimously find that the defendant committed a knowing killing and thus, second degree murder, then under the edict of acquittal-first instructions, they would not reach the issue of whether this knowing killing was mitigated by passion and provocation. It logically follows, then, that if those same jurors found the defendant *not* guilty of a knowing killing, thus acquitting him of second degree murder, then they necessarily should be forced to acquit the defendant of voluntary manslaughter, having found the required mens rea of a knowing or intentional killing lacking.

- 20 -

Relative to acquittal-first jury instructions, our supreme court has held that "where a criminal defendant is entitled to jury instructions on lesser-included offenses, the trial court shall instruct the jury to consider the offenses in order from greatest to least within each count of the indictment" and that the jury "shall not proceed to consider any lesser-included offense until it has first made a unanimous determination that the defendant is not guilty of the immediately-preceding greater offense." *State v. Davis*, 266 S.W.3d 896, 910 (Tenn. 2008). The defendant in *Davis*, however, was convicted of first-degree premeditated murder. Although the defendant argued on appeal that "requiring a jury to reach a unanimous verdict of not guilty on a greater offense before it may consider lesser-included offenses" was inconsistent with state law, he made no claim that his crime was the result of passion produced by adequate provocation. *Id.* at 901. In rejecting the defendant's argument, the high court stated that "a jury considering a greater offense, by necessity, simultaneously considers, albeit not explicitly, all applicable lesser-included offenses supported by the proof" and that a defendant is not "'cheated' out of a jury's consideration of lesser-included offenses simply because the jury is required to deliberate, and may convict, on the greater offense, first." *Id.* at 904-05. Although that analysis is correct with respect to, as addressed by the *Davis* court, first and second degree murder, it is inapplicable to first and second degree murder *vis-à-vis* voluntary manslaughter because voluntary manslaughter requires the consideration of the crime having been committed in a state of passion followed by adequate provocation, which factors are exclusive to the crime of voluntary manslaughter. Although the issue presented in the present case may be distinguished from *Davis*, we are constrained at this point to follow *Davis* and affirm the use of acquittal-first instructions. This holding effectively precludes granting the defendant relief on his complaint about the lack of adequate jury instructions regarding voluntary manslaughter.

Having so held based upon an earlier case decided by our supreme court, we pause to comment respectfully that the supreme court should evaluate further the voluntary manslaughter instruction issue so as to consider whether the mitigation components of that offense should be charged in tandem with the instructions on murder. A determination of whether this should be done is facilitated by addressing the functional status of the passion and provocation components of the offense of voluntary manslaughter: Are the provisions for passion and provocation essential elements of the offense? If so, augmenting the murder instructions is problematic. The term "element" in the context of criminal proscriptive statues, however, denotes a component of such a statute that the State is required to prove beyond a reasonable doubt. *See* T.C.A. § 39-11-201. The State's burden to prove the crime's essential elements has been elevated to the status of a due process mandate. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The passion and provocation components of the crime of voluntary manslaughter are exculpatory in nature–a largess in favor of a defendant–and logically cannot form a component of the State's burden of proof; yet, the functional status of these terms has remained somewhat cloudy.

*State v. Williams*, 38 S.W.3d 532 (Tenn. 2001), is somewhat notable for referring to the passion and provocation components of manslaughter as elements. *Williams*, however, was an appeal from a conviction of second degree murder. As a defense to the charge of murder, Williams claimed that the proof showed he had engaged in mutual combat with the victim, thereby invoking a common law defense to a homicide charge. The *Williams* court held that "the trier of fact must consider all facts surrounding a killing, including the facts giving rise to an agreement to combat, to determine whether the killing resulted from 'a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.'" *Id.* at 539. The court determined that the common law notion of mutual combat was now subsumed within the framework of the offense of voluntary manslaughter. *Id.* at 538. Further, the court, finding that the jury had heard the defendant's proof, held that, "by its verdict, the jury obviously rejected" the argument of mutual combat and that the issue conclusively lay within the province of the finder of fact. *Id.* The result was that the evidence was held to be sufficient "to support the jury's verdict of guilt[y] *on the charge of second degree murder,*" *id.* (emphasis added), despite the *defendant's* attempt to show that his passion and provocation abated his crime to one of manslaughter. The plain implication is that the court viewed the advancement of passion and provocation as a defensive function, albeit one that failed given the customary deference to the jury's prerogative. Whether passion and provocation are "elements" of the offense of voluntary manslaughter had no play in the court's decision, and it certainly did not hold that these factors are elements. Indeed, the *Williams* court made the statement about the passion and provocation terms being elements distinguishing manslaughter from second degree murder while explaining that malice is no longer the distinguishing factor between murder and the lesser forms of homicide. *Id.* It should be clear that Justice Birch in *Williams* was not using the term "element" as a term of art–as an essential element in the way we have defined it above.

That said, we recognize that some opinions of the court of criminal appeals, including one by the author of the current opinion, state without analysis that voluntary manslaughter is a lesser included offense of first and second degree murder under part (b) of *State v. Burns*, 6 S.W.3d 453 (Tenn. 1999). *Burns* part (b) was essentially a shoehorn device for determining that an offense is a lesser included offense of a greater offense even though the elements of the lesser offense are not subsumed within the greater. *See id.* at 466-67; *see, e.g., State v. Paul Clifford Moore, Jr.,* No. E2015-00585-CCA-R3-CD, slip op. at 16 (Tenn. Crim. App., Knoxville, May 12, 2016) ("As to Moore's argument that voluntary manslaughter is an atypical lesser included offense because it appears to have an additional element that the greater offense does not, we note that the Tennessee Supreme Court fully addressed this scenario under subsection (b)(1) of its definition of lesser included offenses in *State v. Burns* . . . ."); *State v. Mario Ward,* No. W2007-00672-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Jackson, Oct. 27, 2008)

("[T]he law is settled that attempted voluntary manslaughter is a lesser included offense of attempted first degree murder under part (b) of the Burns test." (citing *State v. Dominy*, 6 S.W.3d 472, 477 (Tenn. 1999)); *State v. Hezekiah Cooper*, No. W2005-02481-CCA-R3-CD, slip op. at 15 (Tenn. Crim. App., Jackson, Dec. 20, 2007) ("In this case, the State concedes that voluntary manslaughter is a lesser included offense of first and second degree murder." (citing *Dominy*, 6 S.W.3d 472, 477 n.9 (Tenn. 1999)); *State v. Walter Wilson*, No. W2001-01463-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Jackson, Sept. 4, 2002) (inferring that voluntary manslaughter is a lesser included offense of first degree murder under *Burns* part (b) because footnote 9 in *Dominy* "referred . . . to the 'passion' language . . . as reflecting a less culpable mental state than required for first- or second-degree murder"). We have no doubt that voluntary manslaughter *may* fall within *Burns* part (b)'s threshold for offenses the elements of which indicate a lesser kind of culpability, but to imply that the adoption of *Burns* part (b) was the development that made it so was a wide-spread misreading of *Dominy*.

To explain, we begin by noting that the typical precedential basis for saying that voluntary manslaughter is a lesser included offense of first and second degree murder via *Burns* part (b) is the oft-mentioned footnote 9 in *Dominy*, 6 S.W.3d at 477 n.9, the companion case to *Burns*. *See, e.g.*, *State v. Jeffery Lee Mason*, No. M2002-01709-CCA-R3-CD, slip op. at 6 (Tenn. Crim. App., Nashville, May 19, 2004) (addressing Mason's conviction of attempted voluntary manslaughter as a lesser included offense of attempted first degree murder and stating that "[a]ttempted voluntary manslaughter is a lesser included offense of attempted first degree murder under the *Burns* test"). In *Dominy*, however, the supreme court was reflecting upon jurisprudential history. It observed that *State v. Trusty*, 919 S.W.2d 305 (Tenn. 1996), the erstwhile regimen for determining lesser included offenses in which the high court endeavored to make voluntary manslaughter a lesser included offense of murder, had failed to recognize that voluntary manslaughter was already a lesser included offense of first and second degree murder even without the high court's machinations in *Trusty*. The prevailing regimen for determining lesser included offenses prior to *Trusty* was the so-called "*Blockburger*" test for lesser included offenses as espoused by the earlier decision of *Howard v. State*, 578 S.W.2d 83 (Tenn. 1979). Under this test, an offense was a lesser included offense of a greater offense when all of its essential elements were included with the greater offense. The historical time period being referenced in *Dominy* was the time between the enactment of the present criminal code in 1989 and the filing of *Trusty* in 1996, a time when the *Howard* rule prevailed vis-a-vis the terms of the new code. In *Dominy*, Justice Drowota said, "*Trusty* failed to recognize that the 'passion' language in the definition of voluntary manslaughter *simply reflects a less culpable mental state* than required for first or second degree murder." *Dominy*, 6 S.W.3d at 477 n.9 (emphasis added). Hence, the court was saying that, during this foregoing time period, voluntary manslaughter's elements were included within the elements of first and second degree murder, making it a lesser included offense

of those greater offenses; the passion and provocation components of voluntary manslaughter were not essential elements of the crime but "simply reflect[ed] a less culpable mental state than required for first or second degree murder." In footnote 9, the *Dominy* court then stated, "Therefore, voluntary manslaughter is a lesser included offense of first and second degree murder." The reliance of progeny upon footnote 9 as "holding" that voluntary manslaughter *becomes* a lesser included offense of first and second degree murder via *Burns* part (b) probably stems from the *Dominy* court's citing, immediately after the above statement, the *Burns* test, emphasizing the language of the (b) part. Close inspection of the citation, however, reveals that Justice Drowota used the analogous "see" citation for this purpose. The import of this mechanism, combined with the preceding statement, is that *Burns* part (b) afforded analogous or conducive support, not determinative authority, for the statement. The more precise interpretation of *Dominy*, therefore, is that the passion and provocation components of voluntary manslaughter are defensive considerations and not essential elements of that offense.

Furthermore, this treatment of this offense is accommodated by statute. The passion and provocation components of voluntary manslaughter do not negate the *mens rea* elements of intentional and knowing that underlie the murder offenses (in the same way that the passion and provocation construct negated the existence of malice at common law); however, Code section 39-11-203 provides, "A ground of defense, other than one (1) negating an element of the offense or an affirmative defense, that is not plainly labeled in accordance with this part *has the procedural and evidentiary consequences of a defense.*" T.C.A. § 39-11-203(e)(1) (emphasis added). The ambit of this provision embraces the passion and provocation components of the voluntary manslaughter statute. Recognizing these components as having defensive import does not mean that one must be able to label them collectively as a particular type of defense. It just "is what it is."

Determining, therefore, that the law at least does not affirmatively provide that these components of voluntary manslaughter are true elements of the offense–and further that the law does not preclude the contrary proposition–the issue is one of common sense and logic. On this point, the notion that passion and provocation in the manslaughter statute are essential elements of that offense is analytically unsound. For example, when voluntary manslaughter is the conviction offense, would not classifying passion and provocation as elements of that offense mean that the State's failure to prove those "elements," exculpatory though they may be, result in a reduction of the charge or an absolute acquittal? In that circumstance, it should be obvious that all the State should be required to show is a knowing killing. That showing should entitle it to a conviction of the charged offense of voluntary manslaughter.

Requiring the State to prove what is essentially an exculpatory circumstance is akin to a house divided unto itself. If in a given case there is a concern about the

adequacy of the evidence of passion or provocation, courts should comprehend that the concern is really for the evidentiary justification of a jury instruction on voluntary manslaughter; it is not an issue of the "sufficiency" of the evidence establishing essential elements of the crime. *See Burns*, 6 S.W.3d at 467-69 (explaining the process for determining when the evidence justifies a jury instruction on a lesser included offense). Once the proper determination about instructing the jury is made, the jury's decision resolves, if necessary, all other issues about the terms of voluntary manslaughter.

Therefore, viewed in this light, the passion and provocation components of voluntary manslaughter do not pose a structural barrier to augmenting the standard jury instructions on first and second degree murder to acknowledge the effect of the lessened culpability for an intentional or knowing killing.

As a final note, we acknowledge that the basic pattern jury instruction for second degree murder concludes with the following statement:

> The distinction between voluntary manslaughter and second degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

T.P.I. – Crim. 7.05(a) (16th ed). Although this statement imparts some information about voluntary manslaughter, it does not explain how this information may be used amid the jury's consideration of second degree murder. At any rate, the pattern instruction on first degree premeditated murder contains no reference to the effect of the voluntary manslaughter components upon first degree murder.

### III. *Death of a Fetus*

The defendant raises a number of issues relative to the death of the victim's unborn child. First, the defendant contends that Tennessee Code Annotated section 39-13-214, which includes human embryos or fetuses as victims of criminal acts, is void for vagueness and violates his due process rights because it fails to define when an unlawful killing occurs. In the alternative, the defendant argues that the trial court erred by failing to instruct the jury regarding the legal definition of death, thus preventing the State from establishing the defendant's guilt of murder. Second, the defendant contends that Tennessee's fetal homicide statute is unconstitutionally broad "because the State is asserting an interest in fetal life prior to viability that directly conflicts with the defendant's rights to due process and liberty" and that the exceptions to the fetal homicide statute violate the Equal Protection Clause.

Tennessee Code Annotated section 39-13-214 provides as follows:

(a) For the purposes of this part, "another" and "another person" include a human embryo or fetus at any stage of gestation in utero, when any such term refers to the victim of any act made criminal by this part.

(b) Nothing in this section shall be construed to amend § 39-15-201, or §§ 39-15-203 – 39-15-205 and 39-15-207 [regarding abortion].

(c) Nothing in subsection (a) shall apply to any act or omission by a pregnant woman with respect to an embryo or fetus with which she is pregnant, or to any lawful medical or surgical procedure to which a pregnant woman consents, performed by a health care professional who is licensed to perform such procedure.

Although this statute, prior to 2011, referred to "a viable fetus of a human being," *see* T.C.A. § 39-13-214 (2010), the 2011 amendment removed the viability requirement, altering the language to read that "another" included "a fetus of a human being, regardless of viability of the fetus," *see* § 39-13-214 (Supp. 2011). The statute was again amended in 2012 to its present version, which removed the aforementioned language and substituted the inclusion of "a human embryo or fetus at any stage of gestation in utero." T.C.A. § 39-13-214 (Supp. 2012).

With respect to the defendant's contention that the aforementioned statute is void for vagueness in that it fails to define "at what point a potential embryo or fetus falls under the protection of the homicide statute," we are unpersuaded. "A law is void for vagueness if it fails either to give a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited or to provide sufficient standards for enforcement." *Moncier v. Board of Prof'l Responsibility*, 406 S.W.3d 139, 152 (Tenn. 2013) (citing *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999)). Here, the legislature's intent in amending the statue could not have been more clear: they removed the viability requirement and replaced it with language to include "a human embryo or fetus *at any stage of gestation in utero*." T.C.A. § 39-13-214 (emphasis added). Thus, if a human embryo exists, it is protected under the statute. The summary of the bill which enacted the current amended statute is instructive on this point:

Under present law, the victim of an assaultive offense or a homicide includes a fetus of a human being, regardless of viability of the fetus, when any such term refers to the victim of any act made criminal by the provisions governing such offenses, and when at the time of the criminal act the victim was pregnant. It is the legislative intent that such provision in no way affect abortion, and such provision may not apply to acts that are committed pursuant to usual and customary standards of medical practice during diagnostic or therapeutic treatment.

This bill rewrites the above provisions. This bill instead specifies that the victim of an assaultive offense or a homicide includes a human embryo or fetus at any stage of gestation in utero, when any such term refers to the victim of any act made criminal by the provisions governing such offenses, and when at the time of the criminal act the victim was pregnant. The provision would not apply to any act or omission by a pregnant woman with respect to an embryo or fetus with which she is pregnant, or to any lawful medical or surgical procedure to which a pregnant woman consents, performed by a health care professional who is licensed to perform such procedure.

H.B. 3517, 107th Gen. Assemb., Reg. Sess. (Tenn. 2012). By further expanding the 2011 statutory language, which referred to a human fetus "regardless of viability," to include a human *embryo* or fetus "at any stage of gestation in utero," the legislature removed any question about the point at which an unborn child is considered a victim of a criminal offense. Thus, the defendant's vagueness argument is unavailing. Likewise, the defendant's contention that the trial court erred by failing to instruct the jury as to the legal definition of death cannot be maintained. By including a human embryo or fetus "at any stage of gestation in utero" in the definition of "another," the legislature clearly intended that the cessation of existence of any unborn child caused by a criminal offense (in this case, the second-degree murder or "knowing killing of another," *see* T.C.A. § 39-13-210(a)(1)) constitutes a death. Instructing the jury on the legal definition of death, therefore, was unnecessary.

The defendant also asserts that, because the statute lacks a requirement that the defendant be aware of the pregnancy of the victim of a criminal offense, it violates the due process principle that the inclusion of mens rea is required. The statute at issue, however, does not define a criminal offense; rather, it defines a particular victim of criminal offenses. As such, the statute need not require mens rea. The operative

proscriptive statute, in this case, Tennessee Code Annotated section 39-13-210, establishes the mens rea by requiring that a killing be knowing. To the extent the defendant is arguing that the State failed to prove he was aware that the victim was pregnant in order to prove him guilty of knowingly killing the victim's unborn child, the trial testimony belies this contention. Mrs. Jones testified that the defendant was well-aware of the victim's pregnancy, even accompanying her to appointments with her physician and assisting her with the transportation of a new crib, and Mr. Crutchfield testified that, during a telephone conversation on the day of the murder, he overheard the victim's screaming to the defendant, "Quit hitting me. I'm pregnant."

With regard to the defendant's arguments that the statute at issue violates his rights of due process and equal protection under the law, these arguments, too, must fail. The defendant claims that the State has no compelling interest in the protection of a non-viable fetus, thus rendering the pertinent statute overbroad. Although a statute "may be challenged as overbroad when it reaches a substantial amount of constitutionally protected conduct," *State v. Burkhart*, 58 S.W.3d 694, 700 (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982)), the defendant has failed to identify the sort of constitutionally-protected conduct which the statute allegedly seeks to prohibit. As the trial court posited in its order denying the defendant's motion to dismiss the charges of the murder of the unborn child, "If the fetus of [the victim] was not viable, does the [d]efendant claim he had the right to destroy it? Surely, the discharge of a firearm into another person is not constitutionally protected conduct." Without question, it is not.

Likewise, the statute at issue does not violate the defendant's right to equal protection under the law. The defendant asserts that he is being treated differently than a pregnant woman who kills her child in utero. Using the rational basis test, *see Dee Ann Curtis Gallaher v. Curtis J. Elam*, 104 S.W.3d 455, 461 (Tenn. 2003), the trial court determined that the defendant and the victim, "or any other pregnant female, are not similarly situated" because the pregnant woman is "carrying a child in her own body" and the defendant was not. The trial court continued as follows:

> This difference is founded upon a legitimate state interest and the statute bears a reasonable relationship to that interest. As explained above, the State has a legitimate interest in protecting life and potential life. The distinction between a pregnant woman and everyone else in the world is a reasonable distinction. Therefore, the statute does not violate the equal protection doctrine of either the state or federal constitutions.

- 28 -

We find no fault in the trial court's rationale. Because the defendant and a pregnant woman are not similarly situated, section 39-13-214 is not violative of the defendant's right to equal protection under the law.

## IV. Sufficiency

The defendant next contends that the evidence adduced at trial was insufficient to support his convictions of second-degree murder and attempted second-degree murder. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Criminal attempt occurs when a person "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-12-101(a)(2). "Second degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210. "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b).

Here, the proof adduced at trial established that, while Mrs. Jones was driving the pregnant victim away from the defendant's residence, the defendant knowingly fired 11 gunshots at Mrs. Jones's vehicle. Six bullets struck the vehicle, two of which hit the victim, killing her and her unborn child. Although the defendant argues on appeal that the State failed to prove that he intended to kill Mrs. Jones, the fact that he repeatedly fired a handgun at a moving vehicle containing both the victim and Mrs. Jones certainly

provided the jury with sufficient evidence of his intent to commit attempted second degree murder.  Moreover, despite the defendant's claims that he was adequately provoked by the victim, thus necessitating a verdict of the lesser-included offense of voluntary manslaughter, such matters of evidentiary weight were within the exclusive province of the trier of fact, and this court will not reweigh such evidence.  *See Dorantes*, 331 S.W.3d at 379.

Taking all of this evidence into consideration, we find that the evidence supports the defendant's convictions of second degree murder and attempted second degree murder.  Although not raised by the defendant on appeal, we hold the evidence likewise supports the defendant's conviction of possession of employing a firearm during the commission of a dangerous felony.

*V.  Sentencing*

Next, the defendant contends that the 68-year sentence imposed by the trial court is excessive and that the trial court erred by ordering consecutive sentencing.  Again, we disagree.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act."  *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).  The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed."  T.C.A. § 40-35-103(5).  Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'"  *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)).  Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute."  *Id.* at 709.

With respect to consecutive sentencing, our supreme court has held that the standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)."  *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013).  In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), the supreme court imposed two additional requirements for consecutive

sentencing when the "dangerous offender" category is used: the court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. *Id.* at 937-39; *see State v. Imfeld*, 70 S.W.3d 698, 707-08 (Tenn. 2002).

In the instant case, the record reflects that the trial court, in sentencing the defendant, considered all appropriate principles set forth in Code section 40-35-210(b). The court found no mitigating factors but found several enhancement factors to be applicable: that the defendant had a previous history of criminal convictions or criminal behavior, that the defendant had previously failed to comply with the conditions of a sentence involving release into the community, that the defendant had no hesitation in committing the crimes when the risk to human life was high,[1] and that the defendant was on probation at the time he committed the instant offenses. S*ee* T.C.A. § 40-35-114(1), (8), (10), (13).[2] The court then imposed the maximum sentence of 25 years for the second-degree murder convictions, the minimum sentence of eight years for the attempted second-degree murder conviction, and the mandatory minimum sentence of 10 years for the firearm conviction, to be served consecutively to the eight-year sentence by operation of law. Because the trial court considered all relevant principles associated with sentencing, no error attends the imposition of these within-range sentences.

With regard to sentencing alignment, the trial court based its imposition of consecutive sentencing on the finding that the defendant was a dangerous offender. *See* T.C.A. § 40-35-115(b)(4). In making this finding, the trial court referenced the statutory requirements of the dangerous offender statute as well as the *Wilkerson* factors and stated as follows:

> One is, is the behavior, as I just stated, indicates little or no regard for human life.
>
> The [c]ourt finds that that does apply in this case. [The defendant] knew that [the victim] was pregnant at the time, and he knew that there were three people in this vehicle that he was

---

[1]     Although it is unclear from the record whether others were present in the vicinity of the shooting, the potential misapplication of this enhancement factor would not alter our analysis.

[2]     It is not completely clear from the record whether the trial court applied the enhancement factor of great personal injury to the victims. *See* T.C.A. § 40-35-114(6). In discussing this factor, the court stated that the factor "can apply" to the homicide convictions in counts one through four but that M[r]s. Jones did not appear to suffer great personal injury and that the damage to her vehicle, while "impactful to [her] financial situation," was less significant "in light of the nature of the offenses that we're talking about here." The trial court concluded its discussion of this factor by stating that it did not "think that that enhancement factor really works to enhance in this case."

- 31 -

shooting at. And this vehicle was driving, fleeing, I'm sure, from M[r]s. Jones's testimony, down this narrow neighborhood street, with houses all around, in the middle of the day. And he shoots not just once or twice or three times into this car, but 11 times that the police were able to recover shells for. And so that certainly is behavior that is indicating little or no regard for human life.

And he didn't hesitate. These people were leaving, and he came out there in the street and starts firing as he walks up the street. And so the [c]ourt does find that the facts in this case do support that.

Next the [c]ourt has to find that the circumstances surrounding the commission of the offense are aggravated. Here we have a domestic situation where a mom, the – the female, was trying to get her daughter to – and grandchild away and to safety. They had made it to the car. The car started. And it's not clear from the facts, at least it wasn't clear to me, is when the first bullet struck, if the vehicle was still parked or if it was already moving. But it was certainly clear that the argument was over, the fight was over. That these folks were leaving and trying to get away.

And [the defendant] tracked them down. He left the house, went across the lawn, came down into the street, and opened fire onto this vehicle. And not only did Ms. Crider lose her life, and not only did her unborn baby lose its life, but the autopsy picture shows that that baby was – was struck right in the head.

And had it not been for the protection of the vehicle, M[r]s. Jones would have been struck as well, we could tell from the trajectories as testified to by the police.

And so this is not just a domestic situation where people are fighting and – and they're wrestling over a gun and somebody gets shot. This is a situation where the domestic situation was over. And he tracked them down for no other point than he was angry and wanted to kill these people. And he exceeded [sic] two out of three times.

- 32 -

And so the [c]ourt finds that those facts are sufficient to show that the circumstances in this case are, in fact, aggravated.

And also the [c]ourt has to find that confinement for an extended period of time is necessary to protect society from the [d]efendant's further criminal conduct. Here we don't have a lot to go on, on [the defendant's] history. And that would normally point to concurrent sentences because if you don't have this track history of showing that you're a dangerous person, then it's – it's difficult for the [c]ourt to find it's necessary to protect society.

But that's not the only factor the [c]ourt can consider. That's one of them. And in fact, the [d]efendant was under supervision when this happened. He was a convicted felon. Wasn't even supposed to have a firearm. He had absconded from his probation.

And so that shows that even when [the defendant] is under the supervision of the state in the community, that he will thumb his nose at those rules and report when he wants to report, have a gun if he wants to have a gun.

There's been some testimony about drugs. I don't know how closely that was connected to [the defendant]. I certainly think probably by a preponderance of the evidence I could find that he – that was – those were his drugs, but I don't think it's beyond a reasonable doubt. So I'm not going to apply – find that he – he had those – those drugs at the time.

He does have a juvenile history, though, that we can look at beyond this felony conviction. And juvenile court's whole purpose is to treat, train, and rehabilitate. And they obviously failed in [the defendant's] case. Even though he doesn't have a violent history, he certainly has a history of people trying to rehabilitate him in the community unsuccessfully.

. . . .

- 33 -

And so when you put together the fact that [the defendant] has been unwilling to follow the rules of probation, to be rehabilitated either through probation or juvenile probation, and that he engages in this incredibly violent act, and then flees the scene, the [c]ourt does find that parole wouldn't be any different. There's no – no doubt in my mind that if he was on parole supervision he's not going to follow the – the – the prohibitions to have a gun, if he wouldn't follow them while he's on probation.

And so the [c]ourt finds that that factor applies as well; that it's necessary to protect society and because he's shown a willingness to engage in violent behavior even while on supervision. And so society does need to be protected from [the defendant's] further criminal conduct.

Now, there is an overriding factor in sentencing considerations. It's one of the – the main principles that the [c]ourt has to follow. And the appellate courts have cited that in determining whether or not someone's a dangerous offender and you can run cases consecutive. It has to be that the aggregate length reasonably relates to the seriousness of the offense.

And here is where – I think where [defense counsel's] argument comes in about the jury rejected first-degree murder in this case. And that if the [c]ourt were to run these sentences consecutive then, in fact, he's going to end up with more than he would have had it been a first-degree murder case. However . . .

And I – I think that's – there's some logic to that argument that [defense counsel] takes.

But when you think about it, had the jury found the [d]efendant guilty of first-degree murder, and I think there was sufficient evidence for them to do that had they chose to, then he wouldn't be looking at 51 years, he'd be looking at possible 137 years 'cause the [c]ourt would still be making these same determinations on whether or not the cases should run

consecutive. So he'd be looking at not just one 51-year sentence, but two 51 years, and perhaps 25 and ten stacked on top of those. So if my math is correct, that turns out by the 137 years.

And so he got a big break. Whether or not I run these consecutive or concurrent, the jury, by finding him guilty of second-degree murder, gave him a – a – a large break, regardless of what I do.

And so when you look at this, I am most struck by the fact that one of these victims had their life stolen without doing a thing. This baby didn't say a word to [the defendant]. This baby didn't pour Sprite in his shoes. This baby did nothing but sit in its mother's womb as she tried to flee from [the defendant] and get away, and he stole that life before that baby could even take its first breath.

And so an aggregate consecutive sentencing I certainly believe would reasonably relate to the seriousness of the offenses that [the defendant] has committed in this case.

The trial court, in this incredibly thorough and well-reasoned analysis, addressed both the statutory requirements for a finding that the defendant was a dangerous offender, *see* T.C.A. § 40-35-115(4), and the requisite *Wilkerson* factors, *see Wilkerson*, 905 S.W.2d at 937-39. As such, the proof established that the defendant was a dangerous offender. We therefore find an adequate basis for the imposition of consecutive sentencing.

## VI. Cumulative Error

Because we have already determined that the defendant is entitled to a new trial based upon the trial court's erroneous exclusion of certain testimony, we need not address his claim of cumulative error.

## Conclusion

Based upon the foregoing analysis, we reverse the judgments of the trial court and remand this matter to the Knox County Criminal Court for a new trial.

_____
JAMES CURWOOD WITT, JR., JUDGE